**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| HOLLY SEGHETTI and JACK SEGHETTI, | * |
| v. | *   Civil No. ELH-16-519 |
| FLAGSTAR BANK, FSB and MORTGAGE CONTRACTING SERVICES | * |

******

**MEMORANDUM**

Plaintiffs Holly and Jack Seghetti bring suit against defendants Flagstar Bank, FSB ("Flagstar") and Mortgage Contracting Services ("MCS") relating to the burglary of plaintiffs' home. Now pending are Flagstar's and MCS's partial motions to dismiss. The parties have fully briefed the motions, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons below, the motions are granted.[1]

**BACKGROUND**

The present dispute arises out of a home (the "property") in Odenton, Maryland that plaintiffs purchased in 2005. Plaintiffs—husband and wife—initially financed their purchase of the property with a mortgage. But plaintiffs fell on hard times, both losing their jobs in 2009, and they refinanced their mortgage with defendant Flagstar in 2012.[2] (ECF No. 26, ¶¶ 14, 16). In 2013, plaintiffs' financial problems came to a head, and they filed for personal bankruptcy, in the process, they discharged their liability in the property. *Id.* at ¶ 17. After filing for bankruptcy, plaintiffs made several attempts to retain the property, including filing mortgage modification applications and attempting to short-sale the house. *Id.* at ¶ 18. According to

---

[1] Because of a temporary imbalance in caseload, I am deciding these two motions for Judge Hollander.
[2] Owing to the fact that this case is at the motion to dismiss stage, all facts are as stated in plaintiffs' amended complaint.

1

plaintiffs, Flagstar rejected these attempts and proceeded to foreclose on the property. *Id.* at ¶ 19. Flagstar then bought the property at its own foreclosure auction on November 23, 2015. *Id.* at ¶ 24. Counsel for Flagstar told Holly Seghetti that the process of finalizing the foreclosure and the Seghettis' eviction would take approximately seven months. *Id.* at ¶ 26. At this point, the Seghettis started moving out of the property but continued to occupy the property for "the majority of their waking time." *Id.* at ¶ 28. Most of the Seghettis' personal property (e.g. jewelry, clothes, and computers) remained in the house. *Id.* at ¶ 30. The Seghettis also continued to pay utility bills and maintain the outside of the home. *Id.* at ¶¶ 33, 37.

In December 2015, three weeks after the foreclosure auction, and before the foreclosure had been ratified, *id.* at ¶ 40, Flagstar conducted an inspection, without plaintiffs' knowledge, of the outside of the property and declared it abandoned.[3] *Id.* at ¶ 47. Flagstar hired MCS, a property preservation firm, to secure and "winterize[e]" the property, and on December 14, MCS hired a vendor to do the job. *Id.* at ¶ 46. The vendor sent two men. *Id.* At the time of the securing, the Seghettis were not at the property and were caught unaware of the goings on. *Id.* When Holly Seghetti returned to the property that afternoon with the Seghettis' three children, she discovered that MCS's vendor had posted a notice on the door of the home stating that the property had been "temporarily secured and maintained . . . to protect it against future deterioration." *Id.* at ¶ 50. She also found that the property's locks had been changed. Unable to get into the home, she left and called Flagstar, which could not provide any information regarding the lockout. *Id.* at ¶ 54. Later that day, Jack Seghetti arrived at the property and gained entry to the home. Upon entering, he observed "that the [MCS vendor] Agents had ransacked the home, overturning furniture, strewing belongings, paper, and garbage all over the

---

[3] Plaintiffs allege that on information and belief, Flagstar hired MCS to conduct the inspection. (ECF No. 26, ¶ 111).

house . . . rummag[ed] through kitchen cupboards" and broken into a safe. *Id.* at ¶¶ 55, 57. According to plaintiffs, "the Agents stole money, jewelry, musical instruments, a gun, [bottles of alcohol] and electronics worth approximately $20,000." *Id.* at ¶ 56. The plaintiffs allege that MCS's vendor's employees strategically moved other items, intending to return later to steal those items as well. *Id.* at ¶ 58. Furthermore, plaintiffs allege that the employees turned off all water in the house, rendering it uninhabitable. *Id.* at ¶¶ 59, 71.

After discovering the damage to their home and the theft of their belongings, the Seghettis filed a police report with the Anne Arundel County Police, and the police took an inventory of the Seghettis' missing property. *Id.* at ¶ 61. The Seghettis also contacted MCS and Flagstar. *Id.* at ¶¶ 60, 64, 66, 67. MCS confirmed that it had secured the property at the direction of Flagstar, but would not reveal the name of the vendor or the names of the vendor's employees who had secured the property. *Id.* at ¶ 64. MCS told the Seghettis that no vendor would return to the property, however, the very next day, a MCS vendor placed another notice on the home's door stating that the property had been "determined to be vacant/abandoned." *Id.* at ¶¶ 67, 68. After the MCS vendor placed the second notice on their door, the Seghettis hired an emergency moving service to immediately move out of the property.

On February 8, 2016, approximately three months after the alleged burglary of the Seghettis' property, the Circuit Court for Anne Arundel County ratified Flagstar's foreclosure. *Id.* at ¶ 74. Shortly thereafter, plaintiffs filed suit against defendants. Plaintiffs have since amended their complaint to assert eleven counts, including violations of the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law §§ 14–201 *et seq.* (Counts I and III), the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law, §§ 13–101 *et seq.* (Count II), conversion (Count IV), trespass (Count V), wrongful eviction (Count VI),

intrusion upon seclusion (Count VII), negligent selection and retention (Count VIII), respondeat superior (Count IX), intentional infliction of emotional distress (Count X), and violation of the discharge injunction of 11 U.S.C. § 524(a)(2) (Count XI).

## STANDARD

Flagstar and MCS have each filed partial motions to dismiss counts I, II, and X of plaintiffs' amended complaint under Rule 12(b)(6).  (ECF Nos. 30, 36).  To adequately state a claim under Rule 12(b)(6), a complaint, relying on only well-pled factual allegations, must state at least a "plausible claim for relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012).  To determine whether a complaint has crossed "the line from conceivable to plausible," a court must employ a "context-specific inquiry," drawing on the court's "experience and common sense."  *Iqbal*, 556 U.S. at 680.  When performing this inquiry, a court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).  A court, however, does not afford the same deference to legal conclusions.  *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### A. Plaintiffs' MCDCA and MCPA Claims (Counts I and II)

In Counts I and II of their amended complaint, plaintiffs allege that Flagstar and MCS violated § 14–202(8) of the MCDCA and § 13–301(14)(iii) of the MCPA because they locked plaintiffs out of their home and attempted to collect on plaintiffs' mortgage debt without any right to possession of the property.  In response, Flagstar argues that securing a property is not a

"debt collection" action covered by the MCDCA and MCPA and thus, it is not liable under these statutes. MCS avers the same, and also relatedly, that it is not a debt collector for the purposes of the MCDCA and MCPA. I agree with defendants.

The MCDCA "prohibits debt collectors from utilizing threatening or underhanded methods in collecting or attempting to collect a delinquent debt." *Pruitt v. Alba Law Grp., P.A.*, No. 15-0458, 2015 WL 5032014, at *3 (D. Md. Aug. 24, 2015) (internal quotation marks and citations omitted). § 14–202(8) of the MCDCA provides that a debt collector may not "[i]n collecting or attempting to collect an alleged debt . . . [c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Before asserting a § 14–202(8) claim, plaintiffs must first show that defendants were engaging in "an attempt to collect a debt." *Covert v. LVNV Funding, LLC*, No. 13-0698, 2013 WL 6490318, at *8 (D. Md. Dec. 9, 2013), *aff'd on other grounds*, 779 F.3d 242 (4th Cir. 2015). § 13–301(14)(iii) of the MCPA states that any violation of the MCDCA is also a violation of the MCPA. Md. Code Ann., Com. Law § 13–301(14)(iii). As all parties acknowledge, plaintiffs' MCPA claim is derivative of its claim Count I. Therefore, the legal standard for plaintiffs' MCPA claim is the same as for their MCDCA § 14–202(8) claim.

Plaintiffs' claims under the MCPA and § 14–202(8) of the MCDCA fail because neither Flagstar nor MCS were engaged in debt collection activity. A trio of cases from outside this district is instructive. In *Alqaq v. CitiMortgage, Inc.*, No. 13-5130, 2014 WL 1689685 (N.D. Ill. Apr. 29, 2014), a plaintiff, in a fact pattern remarkably similar to the one here, filed an action against two property preservation firms after one of the firms was directed to winterize plaintiff's home and instead made off with plaintiff's property. As here, a mortgagee foreclosed on the home and dispatched the firm to secure the property after a determination that the property was

vacant. The court, however, found that the property preservation defendants were not engaged in debt collection under the federal Fair Debt Collection Practices Act ("FDCPA"), [4] because it determined that the property preservation defendants' actions were "incidental to debt collection and . . . [were] not dispossession or disablement of property to enforce a security interest . . . ." *Id.* at * 4. In *Gordon v. Bank of New York Mellon Corp.*, 964 F. Supp. 2d 937 (N.D. Ind. 2013), another case involving an analogous fact pattern, the Northern District of Indiana held that a property preservation defendant's actions, which including breaking into plaintiffs' home, removing their belongings, and trashing their home, were "not inherently associated with the collection of a debt" and thus, they were not covered by the FDCPA. *Id.* at 948. Lastly, in *Platek v. Safeguard Properties Inc.*, No. 12-1607, 2014 WL 2808908, (W.D. Pa. June 19, 2014), the Western District of Pennsylvania, echoing *Gordon* and *Alqaq*, held that securing a property was not "debt collection" because to hold otherwise would "misconstrue[] the 'principal purpose' of such activity." *Id.* at *1.

As in *Alqaq*, *Gordon*, and *Platek*, MCS's actions did not constitute debt collection. The allegations levied against MCS by plaintiffs mirror those in the aforedescribed cases. Flagstar called upon MCS to secure the property after Flagstar had already foreclosed on the property and deemed it abandoned. According to plaintiffs, rather than secure the property, MCS hired a vendor whose employees instead ransacked plaintiffs' home and stole $20,000 in cash and belongings. (*See* ECF No. 26, ¶¶ 55–56). The employees also posted notices stating that plaintiffs' property had been abandoned and turned off water in the house. These alleged actions, however unseemly, had no relation to the collection of debt. That is, Plaintiffs make no

---

[4] The FDCPA is the federal analogue to the MCDCA. Like the MCDCA, the FDCPA also requires a plaintiff show that "the plaintiff has been the object of collection activity arising from consumer debt." *Pugh v. Corelogic Credco, LLC*, No. 13-1602, 2013 WL 5655705, at *3 (D. Md. Oct. 16, 2013).

factual averment that there was any connection between the conduct of MCS's vendor and an attempt to collect debt. Indeed, plaintiffs plead no facts showing that MCS even knew of the debt in the first place. For instance, the notice posted on the front door of the home made no mention of any debt, rather stating, in relevant part, that "THIS IS NOT A NOTICE OF EVICTION, RENTAL OR SALE. The property inspector has temporarily secured and maintained this property to protect it against future deterioration." (ECF No. 26, ¶ 50). The actions of MCS were therefore, "incidental to debt collection," *Alqaq*, 2014 WL 1689685 at *4, and "not inherently associated with the collection of a debt." *Gordon*, 964 F. Supp. 2d at 948. As a matter of law, plaintiffs have not shown that in "collecting or attempting to collect an alleged debt," MCS made any "[c]laim, attempt, or threat[ ] to enforce a right with knowledge that the right does not exist." Md. Code Ann., Com. Law § 14-202. Therefore, counts I and II of plaintiffs' amended complaint against MCS are dismissed.

Likewise, Flagstar did not engage in debt collection. The gravamen of plaintiffs' allegations against Flagstar for Counts I and II are that Flagstar designated their property as abandoned and dispatched MCS to winterize the property and change the locks. (ECF No. 26, ¶ 64). Crucially, plaintiffs have again made no factual averment suggesting a nexus between Flagstar's attempts to secure the property and plaintiffs' debt. The only scintilla of support for the argument that Flagstar was attempting to collect plaintiffs' debt is plaintiffs' conclusory allegation that Flagstar "sent the Agents as part of their effort to collect on the Plaintiff's mortgage debt." *Id.* at ¶ 49. But because plaintiffs provide nothing else to substantiate this legal conclusion, it is not enough to survive a motion to dismiss. Even putting aside plaintiffs' pleading deficiencies, it is hard to imagine that the actions of MCS's vendor's employees—who were two steps removed from Flagstar's control—were part of a scheme by Flagstar to collect

debt. According to plaintiffs, just three weeks before the attempted secure, Flagstar had informed them that the process of finalizing the foreclosure and eviction would take almost seven months. *Id.* at ¶ 26. For Flagstar to then decide a mere three weeks later that it would end-run its own eviction timetable by first falsely deeming the property abandoned and then enlisting MCS to burglarize plaintiffs' home—all in the name of protecting the property—defies credulity.[5] Accordingly, plaintiffs' counts I and II against Flagstar are dismissed as well.

### B. Plaintiffs' Intentional Infliction of Emotional Distress Claims

Plaintiffs also assert claims for intentional infliction of emotional distress ("IIED") against defendants under theories of direct and vicarious liability. Defendants argue that these claims must be dismissed because plaintiffs do not meet the high burden required to present a viable IIED claim. I consider plaintiffs' direct liability IIED claim and vicarious liability IIED claim separately.

#### I. Plaintiffs' Direct Liability IIED Claim

Plaintiffs first assert a direct liability IIED claim against defendants. Plaintiffs appear to allege that Flagstar's and MCS's reckless hiring of MCS and MCS's vendor, respectively, renders them directly liable for IIED. In Maryland, the tort of IIED is "rarely viable and is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 319 (Md. Ct. Spec. App. 1995) (internal citations and quotation marks omitted). To plausibly plead a claim for IIED, a plaintiff must show "(1) intentional or reckless conduct that is (2) extreme and outrageous and is (3) causally connected to the emotional distress, which is (4) severe." *Doe v. Salisbury Univ.*, 123 F. Supp.

---

[5] This is not to say that the securing of a property can never be a debt collection activity. One can easily imagine a scenario in which a defendant uses securing, or the threat of securing, to coerce a debtor to pay. There is no plausible allegation, however, that this is the case here.

3d 748, 759 (D. Md. 2015). To survive a motion to dismiss, plaintiffs must have "pled and proved with specificity" each element of the tort. *Arbabi v. Fred Meyers, Inc.*, 205 F. Supp. 2d 462, 466 (D. Md. 2002).

Plaintiffs' direct liability claim fails on two independently sufficient grounds. First, plaintiffs have not shown that defendants' actions plausibly constituted extreme and outrageous conduct. To satisfy this element, defendants' conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Khalifa v. Shannon*, 945 A.2d 1244, 1254 (Md. 2008) (quoting *Hixon v. Buchberger*, 507 A.2d 607, 609 (Md. 1986)) (internal citations and quotation marks omitted). Here, Flagstar's employment of MCS, and MCS's succeeding employment of a vendor for the purposes of securing plaintiffs' property, even if reckless, is not so outrageous or extreme as to be "intolerable in a civilized community." *Id.* Plaintiffs make no allegation that either Flagstar or MCS directed MCS's vendor's employees to ransack plaintiffs' home and steal their belongings. Thus, any conduct that could be characterized as "extreme and outrageous" is attributable to only MCS's vendor's employees, and not Flagstar or MCS, under a theory of direct liability. Although defendants may be liable for their allegedly reckless hiring under another count, that hiring cannot subject them to a direct liability IIED claim. On this ground alone, I dismiss plaintiffs' direct liability IIED claim against defendants.

Alternatively, plaintiffs' direct liability IIED claim fails because they do not plead sufficient facts showing that the alleged tortfeasors' actions caused them severe emotional distress. Plaintiffs must carry a "high burden" to meet the fourth element of IIED. *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 114 (Md. 2000). To meet that burden, plaintiffs must show

that they "suffered a severely disabling emotional response to the defendant's conduct," and that "the distress inflicted is so severe that no reasonable man could be expected to endure it." *Harris v. Jones*, 380 A.2d 611, 616 (Md. 1977). Put another way, the ensuing distress "must leave one unable to function and unable to tend to necessary matters." *Jones v. Family Health Centers of Baltimore, Inc.*, 135 F. Supp. 3d 372, 383 (D. Md. 2015) (internal quotation marks and citations omitted). This Court has held that even where a plaintiff "suffered severe bouts of stress, anxiety, depression, sleeplessness, and has developed shingles, constant aches and pains, and uncontrollable clenching of his jaw," he did not suffer distress rising to the level necessary to plead a viable IIED claim. *Williams v. Wicomico Cty. Bd. of Educ.*, 836 F. Supp. 2d 387, 399 (D. Md. 2011); *see also Caldor, Inc. v. Bowden*, 625 A.2d 959, 963–65 (Md. 1993) (evidence that a plaintiff lost weight, distrusted others, and went to a psychologist were insufficient to survive a judgment notwithstanding the verdict); *Moniodis v. Cook*, 494 A.2d 212, 219 (Md. Ct. Spec. App. 1985), *superseded by statute on other grounds* (plaintiffs who lost sleep, suffered from hives, started smoking more, and suffered from emotional distress did not prove the fourth element of IIED because they continued to manage their lives). Plaintiffs allege here that, as a result of defendants' actions, Holly Seghetti "has suffered from anxiety, panic attacks, loss of sleep, elevated blood pressure, and depression." (ECF No. 26, ¶ 119). They further allege that she experienced anxiety regarding her pregnancy, and that the break-in has caused a strain on plaintiffs' relationship and their relationship with their family. *See id.* at ¶¶ 120–122. While these injuries are certainly worthy of sympathy, plaintiffs have not plausibly demonstrated that they suffered severe emotional distress, as the term has been defined by Maryland law. That is, Plaintiffs have not shown they were unable to function and attend to daily activities as a result of defendants' actions. To wit, according to plaintiffs, Holly Seghetti has "spent hundreds of hours

cleaning up her property." *Id.* at ¶ 123. Plaintiffs also admit that they arranged an emergency move out of the property and have subsequently found new housing. *See id.* at ¶¶ 71, 125. These facts show that, in the aftermath of the break-in, plaintiffs have continued to ably manage their lives. So although, if true, the actions of MCS's vendor were reprehensible, plaintiffs have not shown that their "wounds . . . [are] incapable of healing themselves," and thus, have not pleaded facts showing severe emotional distress. *Family Health Centers of Baltimore, Inc.*, 135 F. Supp. 3d at 383 (internal quotation marks and citations omitted). On this ground too, plaintiffs' direct liability IIED claim is dismissed.

## II. Plaintiffs' Vicarious Liability IIED Claim

Plaintiffs also assert a vicarious liability IIED claim against defendants, claiming that defendants are liable for MCS's vendor's actions. Without reaching the questions of whether plaintiffs have adequately alleged an agency relationship between defendants and MCS's vendor, or whether the vendor's conduct was extreme and outrageous, I dismiss this claim because, as discussed above, plaintiffs do not allege severe emotional distress.

## CONCLUSION

For the foregoing reasons, defendants' motions are granted. A separate order follows.

July 13, 2016   /s/
Date   J. Frederick Motz
   United States District Judge